UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
In re:
                                                 Chapter 7

LEVEL 8 APPAREL, LLC,
                                                 Case No. 16-13164 (JLG)

        Debtor.
--------------------------------------------------------------------x
ANGELA TESE-MILNER, as Trustee of the
Estate of Level 8 Apparel, LLC, Debtor,

        Plaintiff,                               Adv. Pro. No. 20-1208 (JLG)

-against-

CAPSTONE CREDIT, LLC and
CAPSTONE CAPITAL GROUP, LLC,

        Defendants.
--------------------------------------------------------------------x


**MEMORANDUM DECISION
ON PLAINTIFF'S AND DEFENDANTS'
MOTIONS FOR PARTIAL SUMMARY JUDGMENT**


**APPEARANCES:**

LAW OFFICE OF WILLIAM F. MACREERY
7 Granite Springs Road
Granite Springs, New York 10527
By:    William F. Macreery

-and-

The Law Firm of Tese & Milner
735 Wickham Avenue, P.O. Box 35
Mattituck, New York 11952
By:    Angela Tese-Milner

*Counsel for the Plaintiff-Trustee*

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
By:     Tracy L. Klestadt
By:     Andrew C. Brown

*Counsel for Defendants Capstone Credit, LLC and Capstone Capital Group, LLC*

**HONORABLE JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE:**

## Introduction[1]

As of the Petition Date, Capstone Capital Group LLC ("Capstone Capital" or "Capstone") was party to a Sales Representative Agreement with Level 8 Apparel LLC (the "Debtor" or "Level 8") dated as of October 29, 2015 (the "Sales Representative Agreement" or "SRA"), and to certain agreements (defined below as the "Costco Agreements") with Costco Wholesale Group and its affiliates (collectively, "Costco") to produce outerwear for Costco. After the Petition Date, the Debtor transferred accounts receivable generated under the Costco Agreements totaling approximately $51 million (i.e., the Accounts Receivable, as defined below) to Capstone Capital.

Angela Tese-Milner is the chapter 7 trustee (the "Trustee") of the Debtor's estate in this converted chapter 11 case. On August 19, 2020, the Trustee commenced this adversary proceeding (the "2020 Adversary Proceeding"). The Trustee's complaint (the "Complaint")[2] contains five claims to relief (each, a "Claim") against one or both of Capstone Capital and Capstone Credit, LLC ("Capstone Credit," and together with Capstone Capital, the "Capstone Defendants," and together with the Trustee, the "Parties"). Generally, the Trustee seeks to avoid the transfers of the Accounts Receivable to the Capstone Defendants, as illegal, unauthorized, and fraudulent post-petition transfers and misappropriations of estate property, and to compel the Capstone Defendants to turn over and pay to the Trustee $51 million or such amount that was collected by them on account of the Accounts Receivable. She also seeks a money judgment against the Capstone

---

[1] Capitalized terms used in this section that are not defined have the same meanings as those terms defined below. Citations to "ECF No. ___" refer to documents filed on the electronic docket of this "Adversary Proceeding" (No. 20-1208).

[2] *Complaint*, ECF No. 1.

3

Defendants, jointly and severally, in the sum of $51 million for the conversion of the Debtor's property and for aiding and abetting the conversion of the Debtor's property.

This is the second of two adversary proceedings that the Trustee has brought against the Capstone Defendants. In the 2019 Adversary Proceeding,[3] the Trustee sued the Capstone Defendants and others to avoid alleged fraudulent transfers of or impose constructive trusts on, property of the Debtor, and to "avoid preferential and fraudulent transfers of, and/or impose constructive trusts on, property of the Debtor, and to impose joint and several liability on some of the Defendants for all of the Debtor's obligations." 2019 Amended Complaint at 2.[4]

The matters before the Court are competing motions for summary judgment in the 2020 Adversary Proceeding (the "Motions," and each the "Trustee's Motion" and "Capstone Defendants' Motion," respectively). The Parties requested leave to file the Motions pursuant to their joint letter to the Court (the "Joint Letter").[5] The letter includes a single statement of the following three issues (the "Issues") they ask the Court to consider in resolving the Motions:

> The "First Issue": "Was the SRA, along with the related agreements executed in connection therewith, a form a [sic] financing agreement between the Debtor and the Capstone Defendants that had to be perfected under Article 9 of the New York Uniform Commercial Code ("UCC"), or rather, did the SRA form that of a service relationship between the Debtor and the Capstone Defendants, whereby the Debtor acted on the Capstone Defendants' behalf?"

> The "Second Issue": "Did the terms of the SRA and the related agreements provide the Debtor with an interest in the goods produced and accounts receivable generated under the SRA, or rather, were all goods produced and accounts receivable

---

[3] *Angela Tese-Milner, as Trustee of the Estate of Level 8 Apparel, LLC, Debtor, v. Bon Seung Kim, a/k/a Sam Kim, a/k/a Scott Kim, et al.*, No. 19-01335 (JLG) (the "2019 Adversary Proceeding").

[4] *Amended Complaint*, 2019 ECF No. 54 (the "2019 Amended Complaint"). Citations to "2019 ECF No. __" refer to documents filed on the electronic docket of the 2019 Adversary Proceeding.

[5] *See Letter of March 31, 2023*, ECF No. 77.

generated under the SRA at all times the sole property of the Capstone Defendants?"

<u>The "Third Issue"</u>: "Alternatively, is the SRA an agreement for the absolute sale and assignment of contract rights and accounts receivable created in the future by the Debtor, subject to the provisions of Article 9 of the UCC?"

Joint Letter at 2. The Parties agreed that the Motions would be filed in the 2020 Adversary Proceeding, but that the Court's decision on the Issues will be applied to the claims in the 2020 Adversary Proceeding and the 2019 Adversary Proceeding (collectively, the "Adversary Proceedings"), as follows:

(i) Claims One, Eighteen, and Twenty-Two in the 2019 Adversary Proceeding, and

(ii) Claims One through Five in the 2020 Adversary Proceeding.

*See* Joint Letter at 2. The Court endorsed the Parties' requests in the Joint Letter.[6]

In filing the Motions, the Capstone Defendants and the Trustee submitted identical Joint Statements of Undisputed and Disputed Material Facts.[7] In support of the Trustee's Motion, the Trustee filed (i) a memorandum of law (the "Trustee Memo."),[8] the affirmation of her counsel, William Macreery (the "Macreery Affirmation"),[9] and a reply memorandum of law in support of her motion (the "Trustee Reply Memo.").[10] She also submitted the *Expert Report of Ronald G.*

---

[6] *Memorandum Endorsed Order of April 14, 2023*, ECF No. 78 (the "Briefing Order").

[7] *Parties' Joint Statement of Undisputed and Disputed Material Facts Pursuant to Local Bankruptcy Rule 7056-1*, ECF Nos. 82, 85 (each the "Joint Statement"). References to the Joint Statement will be to ECF No. 82. The Joint Statement consists of (i) Stipulated Contentions of Fact (Part I) (the "Stipulated Facts"), Trustee's Contended Undisputed Facts (Part II) (the "Trustee Statement"), Capstone Defendants' Contended Undisputed Facts (Part III) (the "Capstone Statement"), Capstone Defendants' Response to Trustee's Contended Undisputed Facts (Part IV) (the "Capstone Response"), and Trustee's Response to Capstone Defendants' Contended Undisputed Facts (Part V) (the "Trustee Response").

[8] *Memorandum of Law in Support of the Trustee's Motion for Partial Summary Judgment*, ECF No. 87.

[9] *Affirmation in Support of the Plaintiff-Trustee's Motion for Partial Summary Judgment*, ECF No. 84. The affirmation includes sixty-one exhibits.

[10] *Plaintiff's Reply Memorandum of Law in Support of the Trustee's Motion for Partial Summary Judgment*, ECF No. 89.

*Quintero, CPA, CFA, CFE, CIRA, CMA, CTP*, prepared by Ronald G. Quintero (the "Quintero Report").[11]   In support of the Capstone Defendants' Motion, the Capstone Defendants filed a memorandum of law in support of their motion (the "Capstone Memo."),[12] the declaration of Joseph F. Ingrassia (the "Ingrassia Declaration" or "Ingrassia Decl."),[13] and a memorandum of law in response to the Trustee Memo. (the "Capstone Opposition Memo.").[14]   The Court heard argument on the Motions.

There are only two sets of agreements relevant to the Motions: the Costco Agreements and the SRA.  The Accounts Receivable were generated under the Costco Agreements, and those agreements unambiguously give Capstone Capital, rather than the Debtor, the right to the Accounts Receivable.  The SRA does nothing to effect a transfer of those Accounts Receivable to the Debtor, but instead, confirms that those Accounts Receivable belong to Capstone Capital.  The contrary premise upon which the Trustee's claims against the Capstone Defendants in the Adversary Proceedings generally rely is that the Accounts Receivable belong to the Debtor because they are property of the Debtor's estate under section 541 of the Bankruptcy Code.  In the Trustee's view, under the SRA, the Capstone Defendants are general unsecured creditors of the Debtor with no interest in the Accounts Receivable.

---

[11] The Quintero Report is annexed as Exhibit 63 to the Macreery Affirmation, ECF No. 84–63.

[12] *Memorandum of Law in Support of Defendants Capstone Credit, LLC's and Capstone Capital Group, LLC's Motions for Orders: (I) Granting Partial Summary Judgment, (II) Excluding the Purported Expert Report and Opinion of Ronald Quintero, and (III) Striking the Attorney Affirmation of Plaintiff's Special Litigation Counsel William F. Macreery*, ECF No. 80.

[13] *Declaration of Joseph F. Ingrassia in Support of Defendants Capstone Credit, LLC's and Capstone Capital Group, LLC's Motion for Partial Summary Judgment Against the Plaintiff-Trustee*, ECF No. 81.  The declaration includes thirty-two exhibits.

[14] *Defendants Capstone Credit, LLC's and Capstone Capital Group, LLC's Memorandum of Law in Opposition of the Trustee's Motion for Partial Summary Judgment*, ECF No. 90.

The Trustee's argument fundamentally hinges on some theory that would allow the Court to consider the Accounts Receivable as though they belonged to the Debtor. The Trustee does not clearly explain what this theory is, but alludes to the principle that a court should elevate an agreement's form beyond its substance. She argues that the Court should credit the Debtor as the owner of the Accounts Receivable because the SRA allocates to the Debtor most of the risks attendant to the relationship between Capstone Capital and the Debtor. There is support for the Trustee's characterization of the SRA. However, the authorities that she cites in support of that principle are distinguishable and have no application here.

The Trustee is attempting to recover on account of a deal that, with the benefit of hindsight, purportedly takes from the Debtor assets that it would have had under a conventional financing agreement. Though the Trustee finds herself in an unenviable position—that is the not the agreement the Debtor entered. The Court can neither rewrite the terms of the Costco Agreements nor of the SRA. For that reason, and as explained fully below, the Court finds that the Accounts Receivable are not property of the estate under section 541 of the Bankruptcy Code.

The Court awards the Capstone Defendants summary judgment dismissing Claims Two through Five, and 2019 Claim One. The Court denies the Trustee summary judgment on those claims. The Court denies the Motions to the extent they seek relief on Claim One and 2019 Claims Eighteen and Twenty-Two.

## Jurisdiction

This Court has jurisdiction over the Motions pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Procedural History

### The Chapter 11 Cases

On November 14, 2016 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor remained in possession and control of its business and assets as the debtor and debtor-in-possession until the Conversion Date.

### The Chapter 7 Case

On August 22, 2018, on the motion of the United States Trustee, the Court converted the Chapter 11 Case (the "Conversion")[15] to a case under chapter 7 of the Bankruptcy Code (the "Chapter 7 Case"). Angela Tese-Milner was appointed as the interim trustee for the Debtor's estate the following day,[16] and became the permanent chapter 7 trustee at the first meeting of creditors held in the Chapter 7 Case following the Conversion.

### The Proofs of Claim

On June 15, 2017, Capstone Capital filed a proof of claim asserting a general unsecured claim against the Debtor in the amount of $4,806,431.79 (the "Capstone Proof of Claim").[17] The Capstone Proof of Claim states that the basis of the claim is the "Sales Representative Agreement dated October 29, 2015." Capstone Proof of Claim at 2. Exhibit A to the rider annexed to the claim consists of "a statement detailing advances and payments [by Capstone Capital] pursuant to Sales Agreement through the Petition Date." On February 9, 2022, Capstone Capital filed an

---

[15] *Order Converting Chapter 11 Case to Chapter 7*, ECF No. 125.

[16] *Appointment of Interim Trustee and Trustee and Designation of Required Bond*, ECF No. 127.

[17] The Original Capstone Proof of Claim, completed on the Official Form 410, is filed on the Court's claims registry as Claim 11-1.

amended proof of claim (the "Capstone Amended Proof of Claim").[18]   In the rider to the claim, Capstone Capital states that the claim arises from certain: (i) unearned commissions that were advanced by Capstone Capital to Debtor under the terms of the SRA, in an amount of not less than $150,000.00; and (ii) unliquidated amounts owed by Debtor to Capstone Capital arising under an indemnification clause contained in the SRA, including, but not limited to, amounts related to the legal fees incurred by Claimant in connection with the Chapter 7 Case.

### The 2019 Adversary Proceeding

On August 20, 2019, the Trustee commenced the 2019 Adversary Proceeding by filing a complaint (the "2019 Complaint")[19] against twelve defendants, including Capstone Capital and nine individuals (the "Individual Defendants").   In that action, the Trustee seeks to recover damages for the alleged systematic diversion, misappropriation and looting of the Debtor's business and assets both before and after the Petition Date.  The 2019 Complaint contains twenty-four claims that are alleged against some or all the defendants.   Capstone Capital is named as a defendant in nine claims.[20]   Capstone Capital filed a motion to dismiss those claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[21]   Over the Trustee's opposition,[22] the Court

---

[18] Capstone Capital's second proof of claim, completed on the Official Form 410, is filed on the Court's claims registry as Claim 11-2.

[19] *Complaint*, 2019 ECF No. 1.

[20] Those were Claims One through Three, Claim Sixteen, Claim Seventeen, Claim Eighteen, Claim Twenty-One, Claim Twenty-Three, and Claim Twenty-Four.

[21] *See Memorandum of Law in Support of Defendant Capstone Capital Group, LLC's Motion to Dismiss Adversary Proceeding,* 2019 ECF No. 7.

[22] *See Trustee's Memorandum of Law in Opposition to The Motion by Capstone Capital Group, LLC to Dismiss the Complaint in This Adversary Proceeding*, 2019 ECF No. 20.

granted the motion and dismissed all the claims against Capstone Capital, but granted the Trustee leave to amend her pleading.[23]

On February 26, 2021, the Trustee amended her complaint in the 2019 Adversary Proceeding to state claims against both Capstone Capital and Capstone Credit.  The 2019 Amended Complaint contains twenty-three claims (each, a "2019 Claim"), four of which are asserted against the Capstone Defendants.  Those asserted against the Capstone Defendants are "2019 Claim One," for Avoidance and Recovery of Preferential Transfers; "2019 Claim Eighteen," for Aiding and Abetting Conversion; "2019 Claim Twenty-Two," for Disallowance of Claims; and "2019 Claim Twenty-Three," for Subordination and Disallowance of Claims.  On March 29, 2021, the Capstone Defendants filed a joint motion to dismiss the 2019 Claims One and Eighteen.[24]  The Trustee opposed the motion.[25]  The Court denied it.[26]

On January 11, 2024, the Trustee filed a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure seeking approval of a stipulation of settlement resolving the claims against the Individual Defendants in the 2019 Amended Complaint.[27]  The Court approved the motion.[28]  The settlement did not impact the claims against the Capstone Defendants.

---

[23] *See Memorandum Decision and Order on Capstone Capital Group, LLC's Motion to Dismiss Adversary Proceeding*, 2019 ECF No. 51.

[24] *See Memorandum of Law in Support of Defendants Capstone Capital Group, LLC's and Capstone Credit, LLC's Partial Motion to Dismiss Adversary Proceeding,* 2019 ECF No. 58.

[25] *See Trustee's Memorandum of Law in Opposition to the Partial Motion by Capstone Capital Group, LLC and Capstone Credit, LLC to Dismiss the Amended Complaint in This Adversary Proceeding*, 2019 ECF No. 66.

[26] *See Memorandum Decision and Order on Capstone Defendants' Motion to Dismiss Amended Complaint,* 2019 ECF No. 71.

[27] *See Application for an Order Pursuant to Rule 9019 Approving Stipulation of Settlement Between the Trustee and All of the Individual Defendants in the Adversary Proceeding and Granting Related Relief*, 2019 ECF No. 183.

[28] *Order Approving Stipulation of Settlement*, 2019 ECF No. 189.

**The 2020 Adversary Proceeding**

On August 19, 2020, the Trustee filed the Complaint, commencing this adversary proceeding against the Capstone Defendants.  The Complaint seeks to avoid and recover alleged illegal, unauthorized, and fraudulent post-petition transfers and misappropriations of Post-Petition Assignments of Accounts Receivable and Post-Conversion Assignments of Accounts Receivable from the Debtor's estate.  The Complaint asserts five claims against one or both of the Capstone Defendants.  To summarize, in her Complaint, the Trustee seeks to:

(i)   Avoid the Post-Petition Financing Statement under sections 362 and 549 of the Bankruptcy Code (Claim One, Complaint ¶¶ 31–38).

(ii)  Avoid and recover the Accounts Receivable or their value from the Capstone Defendants under sections 362 and 542 and sections 549 and 550 of the Bankruptcy Code (Claim Two – Post-Petition Assignments – $45,365,535.44, *id.* ¶¶ 39–47; Claim Three – Post-Conversion Assignments – $6,044,112.35, *id.* ¶¶ 48–56).

(iii) Recover $51,409,647.79 in damages from Capstone Credit under state law based on its alleged fraudulent misappropriation and conversion of the Accounts Receivable (Claim Four, *id.* ¶¶ 57–60).

(iv)  Recover $51,409,647.79 in damages from the Capstone Defendants under state law based on their alleged aiding and abetting the alleged fraudulent misappropriation and conversion of the Accounts Receivable (Claim Five, *id.* ¶¶ 61–64).

In the Complaint, the Trustee describes the Debtor as an outerwear design import/manufacturing company that produced men's and women's outerwear garments, holding licenses to produce and sell men's outerwear, and as having a private label division, which produced apparel for large retailers, including Costco.  Complaint ¶ 2.  She notes that as of the Petition Date, Capstone Capital transacted business with Costco pursuant to certain agreements

between itself and Costco, known as the Costco Agreements.[29]  *Id.* ¶ 12.  The Trustee says that although each of the Costco Agreements lists "Capstone Capital/Level 8" as the "vendor" of goods, Capstone Capital lacked the expertise to serve as a "vendor" and that, in reality, the Debtor, not Capstone Capital, performed the services charged to the vendor under those agreements.[30] Moreover, she maintains that with conventional factor financing, the Debtor "could have succeeded as a seller of the goods with conventional factoring."  *Id.* ¶ 15.  The Trustee describes the SRA as "a mere artifice and guise to transfer title to the Debtor's assets as security for the Debtor's performance under those agreements, and created only a security interest held by Capstone in the Debtor's assets."  *Id.* ¶ 32.  She says that at all relevant times, the Capstone Defendants' security interest in those assets was unperfected.[31]

The Trustee claims that during the Chapter 11 Case, the Debtor ostensibly "assigned" sixty-one accounts receivable owed by Costco, amounting to $45,365,535.44 (the "Post-Petition Accounts Receivable") to Capstone Credit (the "Post-Petition Assignments of Accounts Receivable").  *Id.* ¶ 18.  She contends that post-Conversion, and between August 23 and September 20, 2018, the Debtor ostensibly "assigned" seven more accounts receivable to Capstone Credit,

---

[29] The Costco Agreements are defined and explained in detail below.

[30] Specifically, the Trustee says that Capstone Capital could not have acted as a "vendor" without Level 8's assistance, because it lacked the expertise to conceive and design seasonal lines of garments, to create samples, to procure orders for garments by store buyers, to arrange for and oversee manufacturing of garments by companies in China and Vietnam, and to arrange for timely production and shipment of goods to customers that were all part of the lengthy sales process.  Complaint ¶ 14.  She contends that, in reality, the Debtor performed all of these duties. Complaint ¶ 15.

[31] The Trustee maintains that as of the Petition Date, Capstone Capital's prepetition lien on Debtor's assets under the SRA had lapsed and become unperfected, and on the Petition Date, the Capstone Defendants held only an unperfected security interest in the Debtor's assets.  Complaint ¶¶ 16, 22, 33.  On November 17, 2016, three days after the Petition Date, the Defendants filed a financing statement, Filing No. 201611176358222, with the New York Secretary of State which claimed a security interest in all assets of the Debtor (the "Post-Petition Financing Statement").  *See* Complaint ¶ 34 & Exhibit 5.  The Trustee contends that the transfer effected by the filing of the Post-Petition Financing Statement is void since it was not authorized by the Bankruptcy Code or the Bankruptcy Court.  Complaint ¶¶ 17, 35.

totaling $6,044,112.35 (the "Post-Conversion Accounts Receivable" and, together with the Post-Petition Accounts Receivable, the "Accounts Receivable"). *Id.* ¶ 23.

The Trustee says that the documents evidencing the Post-Conversion Assignment of Accounts Receivable are identical to those evidencing the Post-Petition Assignment of Accounts Receivable. *Id.* ¶ 24. The documents evidencing those so-called "assignments" state, in part, as follows:

> Pursuant to the accounts receivable financing or factoring agreement between us, and in accordance with the provisions, representations and warranties contained therein, we confirm the transfer and assignment to Capstone Credit, LLC of all our right, title and interest in and to the accounts receivable represented by invoices identified above . . . . Capstone Credit, LLC shall have no obligation to perform, in any respect, any contracts relating to any of said accounts receivable.

*Id.*, Exhibit 1. The Trustee maintains that, notwithstanding those representations, no such agreements exist, that the transfers pursuant to the Sales Representative Agreement or the Costco Agreements were outside the ordinary course of the Debtor's business, and that the Capstone Defendants neither sought nor obtained Court approval to conduct the transfers, as required by section 364 of the Bankruptcy Code. *See id.* ¶ 17. She also contends that the Capstone Defendants (i) did not obtain the Trustee's consent or Bankruptcy Court approval of the Post-Conversion Assignments of Accounts Receivable, (ii) did not give any notice to the Trustee or the Court prior to making the Post-Conversion Assignments of Accounts Receivable, and (iii) did not give anything of value to the Debtor, the Trustee, or the Debtor's estate in exchange for the Post-Conversion Assignments of Accounts Receivable. *Id.* ¶¶ 25–27.

Finally, the Trustee maintains that certain "Key Personnel" of the Debtors engaged in a continuous plan and scheme, both prior to the Petition Date and during the Chapter 11 Cases and Chapter 7 Cases, to divert and misappropriate all the Debtor's assets from the Debtor. *Id.* ¶¶ 28–

13

29.   She contends that the Capstone Defendants knowingly participated in and substantially

contributed to the fraudulent misappropriation and conversion of the Debtor's business perpetrated

by the Key Personnel by providing the financing for the operations of two alleged successor

companies to Level 8—On Five and Liaison Apparel.  *Id.* ¶ 30.

On September 24, 2020, the Capstone Defendants filed a motion to dismiss the Complaint,

arguing that dismissal was warranted based on the "Prior Pending Action Doctrine," on limitation

grounds, and otherwise for failure to state a claim upon which relief could be granted (the "Motion

to Dismiss").[32]   On February 3, 2021, the Court granted the motion in part and denied it in part.

*See* Decision and Order on Motion to Dismiss.[33]   The following matters at issue in the Complaint

remain unresolved:

> Claim One: The portion of the claim seeking relief pursuant to section 362 of the
> Bankruptcy Code remains, which seeks a declaration that the post-petition attempt
> to perfect a security interest in the Debtor's assets and to exercise control of the
> Debtor's assets violated section 362 and are void.
>
> Claims Two and Three: The portions of these claims seeking relief pursuant to
> section 549 of the Bankruptcy Code remain, which seek avoidance of the alleged
> unauthorized and illegal transfers and misappropriations of the Debtor's property
> effected by the Post-Petition Assignments of Receivable and Post-Conversion
> Assignments of Accounts Receivable.
>
> Claim Four: This claim remains in its entirety.  The Trustee brings this Claim
> against only Capstone Credit for the fraudulent misappropriation and conversion of
> estate property by the Post-Petition Assignments of Receivable and Post-
> Conversion Assignments of Accounts Receivable under applicable New York law.

---

[32] *Memorandum of Law in Support of Defendants Capstone Credit, LLC's and Capstone Capital Group, LLC's Motion to Dismiss Adversary Proceeding*, ECF No. 5.

[33] *Memorandum Decision and Order on Defendants Capstone Credit, LLC's and Capstone Capital Group, LLC's Motion to Dismiss Adversary Proceeding*, ECF No. 27 ("Decision on Motion to Dismiss").  The Decision on Motion to Dismiss is also accessible on Westlaw, *In re Level 8 Apparel, LLC*, No. 16-13164, 2021 WL 408981 (Bankr. S.D.N.Y. Feb. 3, 2021), and further references to the Decision on Motion to Dismiss will be to the unpublished decision there accessible.

Claim Five: The portion of this claim seeking recovery against only Capstone Credit for aiding and abetting conversion.

On March 29, 2021, the Capstone Defendants filed their joint answer to the Complaint.[34] Thereafter, the Parties engaged in extensive pre-trial discovery.

The Parties submitted the Joint Statement, including the Stipulated Facts, the Trustee Statement, and the Capstone Statement in connection with the Motions. Before proceeding to the merits, the Court will review the legal standards governing the Motions and resolve challenges to the facts relevant to their disposition.

## **Legal Standards**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. It is made applicable herein by Bankruptcy Rule 7056. A court can grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, on summary judgment, a court considers whether there is a genuine issue to be tried, but does not weigh the evidence itself. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether there is a genuine issue to be tried, a court must resolve any ambiguities and draw any reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). In short, the Court views the evidence in the light most favorable to the non-moving party. *Liberty Lobby*, 477 U.S. at 255.

The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.

---

[34] *Answer*, ECF No. 31.

1995).  If the moving party carries that burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008); *see Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  The non-moving party can only establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "After the non-moving party to the summary judgment motion has been afforded a sufficient time for discovery, summary judgment must be entered against it where it fails to make a showing sufficient to establish the existence of an element essential to its case and on which it has the burden of proof at trial."  *In re Worldcom, Inc.*, 374 B.R. 94, 105 (Bankr. S.D.N.Y. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Where, as here, both parties seek summary judgment, each one has the burden of presenting evidence that would allow the court to "direct a verdict in its favor."  *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-8140, 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013) (quoting *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988)).  Each party's motion "must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  If neither party can do so, a court need not enter judgment for either party.  *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023); *see Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified.").

In their respective responses to each other's statements of undisputed material fact, the Parties purport to raise certain factual disputes. They also assert evidentiary objections to record evidence submitted in support of the Motions. The Court considers those matters below.

## Genuine Disputes of Material Fact

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. Courts find that there is no genuine dispute as to any material fact where (i) the parties agree on the facts, (ii) a reasonable factfinder could not accept the nonmovant's version of the facts on which they disagree, or (iii) assuming the nonmovant's version of them as true would not change the outcome. *City of New York v. Tavern on the Green Int'l LLC*, 351 F. Supp. 3d 680, 687 (S.D.N.Y. 2018); *see also Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012) ("'A fact is material if it might affect the outcome of the suit under the governing law,' and an issue of fact is 'genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010))).

The Parties submitted the Joint Statement, with their respective statements and counterstatements, in accordance with Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York.[35] That rule is intended to "streamline the consideration of summary

---

[35] That rule mandates that all summary judgment motions include "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Bankruptcy Rule 7056-1(b). In turn, the party opposing summary judgment must include in its papers "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." Local Bankruptcy Rule 7056-1(c). If necessary and appropriate, that party can include "additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried." *Id.* The statements in support of, or in opposition to, a summary judgment motion "shall be followed by citations to evidence which would be admissible." Local Bankruptcy Rule 7056-1(e).

judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) (stating the same in the context of Local Civil Rule 56.1).

> The Local Rule does not contemplate a free-for-all of adding irrelevant facts and facts unnecessary to the proper adjudication of a summary judgment motion. Nor does it contemplate creating more or less than an admission or a denial of the truth of the allegation for the purposes of the motion. The Local Rule contemplates the factual statement deemed admitted unless specifically controverted and supported by evidence which would be admissible at trial.

*Emanuel v. Gap, Inc.*, No. 19-cv-03617, 2022 WL 3084317, at *4 (S.D.N.Y. Aug. 3, 2022). Thus, to the extent that either party purports to dispute a fact contained in each other's statements on the basis of admissibility, the Court will consider that fact as undisputed so long as it is supported by a citation to evidence that could be presented in an admissible form at trial. *See Buckman v. Calyon Sec. (USA)*, 817 F. Supp. 2d 322, 328 n.42 (2d Cir. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted."); *Geoghan v. Long Island R.R.*, No. 06-cv-1435, 2009 WL 982451, at *6 (E.D.N.Y. Apr. 9, 2009) ("Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by plaintiff for purposes of this motion.").

### *Disputes Unsupported by Citation to Evidence That Would Be Admissible at Trial*

Certain of the responses to the contended undisputed statements of fact purport to dispute a fact within the contended undisputed statement, but without citation to evidence that would be admissible at trial. Some statements do so even though the statement to which a response is offered

---

Local Bankruptcy Rule 7056-1 is derived from Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. Local Bankruptcy Rules 7056-1 Comment (April 14, 2023); *see MCI Worldcom Commc'n, Inc. v. Commc'n Network Int'l, Inc. (In re WorldCom, Inc.)*, No. 02-13533, 2007 WL 1989262, at *7, n.9 (Bankr. S.D.N.Y. July 9, 2007) (finding that case law applying Local Rule 56.1 is relevant and applicable to cases involving Local Bankruptcy Rule 7056-1 since the local rules "are an adaptation of the Local District Rules" (citing Local Bankruptcy Rule 7056-1 Comment (2005))). Accordingly, case law interpreting Local Rule 56.1 is relevant to the Court's analysis of the Motions.

is supported by admissible evidence.  For example, the Capstone Defendants contend that "the
Vendor Purchase Program Agreement has an internal notation which provides 'Per Lynn, we can
leave [L]evel 8 [A]pparel on there, name is only under [C]apstone [C]apital [G]roup llc.'"
Capstone Statement ¶ 46.  The Trustee responds that this fact is "Disputed, but only as to the
internal nature of the notation."  Trustee Response ¶ 46.  Responses like these are inappropriate
under Local Bankruptcy Rule 7056-1 because they do not controvert the fact contained within the
statement with evidence that would be admissible at trial.  *See Togut v. RBC Dain Correspondent
Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 870 n.1 (Bankr. S.D.N.Y. 2010) (deeming facts
admitted under Local Rule 7056-1 for failure to specifically controvert them with citation to
evidence that would be admissible).  The Court considers such facts undisputed.

### Relevance or Materiality

Certain of the responses to the contended undisputed statements of fact purport to dispute
their relevance or materiality.  Such disputes are evidentiary and are improper in the context of a
response to a statement of undisputed facts under Bankruptcy Rule 7056-1, since they say nothing
about whether a dispute is genuine.  *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542
F.3d 290, 314 (2d Cir. 2008) ("An objection to the admissibility of a document is not the equivalent
of a contention that the document's contents are untrue.").  For example, the Capstone Defendants
contend that "[certain] transmittal forms were never sent to Costco or any other third party."
Capstone Statement ¶ 84.  The Trustee responds that the statement is "Disputed as stated in
Response 82 above.  It is immaterial whether any of the 'Schedule of Assigned Receivables' was
sent to any other party."  Trustee Response ¶ 84.  Arguments about relevance and materiality are
not factual disputes; they are evidentiary objections.  The Court will consider independently

whether a fact is relevant or material to the extent it bears on the disposition of any count, but the interposition of such a "dispute" will not create a genuine dispute of material fact.

### *Lack of Knowledge or Information*

Certain of the responses to the contended undisputed statements of fact purport to state a lack of knowledge or information sufficient to admit or deny the statement. Though "such a response may be appropriate before discovery is concluded," *Scarpinato v. 1770 Inn, LLC*, No. 13-cv-0955, 2015 WL 4751656, at *2 (E.D.N.Y. Aug. 11, 2015), an "answer that '[a party] can neither admit nor deny [a] statement based upon the factual record' is not a sufficient response to establish a disputed fact," *Universal Calvary Church v. City of New York*, No. 96-cv-4606, 2000 WL 1745048, at *2 (S.D.N.Y. Nov. 28, 2000). For example, the Trustee contends that "Capstone/Level 8 was Costco's only supplier of Kirkland Signature men's and ladies' outerwear before the Debtor filed its bankruptcy petition." Trustee Statement ¶ 28. The Capstone Defendants respond that they "deny knowledge and information sufficient to form a belief as to the accuracy of the third sentence in Trustee Statement 28 but do dispute the Trustee's attempts to characterize the Debtor's relationship with Costco." Capstone Response ¶ 28. Because such responses do not specifically controvert a fact by citation to evidence that would be admissible at trial, the Court will disregard them.

### *Contended Undisputed Fact Requires Clarification*

Some responses state that a contended undisputed fact requires clarification. For example, the Trustee contends that "[w]hen Samsung terminated the agreements with Level 8 in 2015, Level 8 turned to the Capstone Defendants for replacement financing and the Debtor introduced Capstone Capital to Costco as the replacement for Samsung for financing the production and sale of garments." Trustee Statement ¶ 27 (citations omitted). The Capstone Response, in part, says

that "Trustee Statement 27 is undisputed in part, but requires clarification, and disputed in part."

Capstone Response ¶ 27. The place for the parties to state what facts are necessary to decide a

motion for summary judgment is in their own statements, and not in their responses to other

parties' statements. *See Emanuel*, 2022 WL 3084317, at *4. They may also, "if necessary, [offer]

additional paragraphs containing a separate, short, and concise statement of additional material

facts as to which it is contended that there is a genuine issue to be tried." Local Bankruptcy Rule

7056-1(c). The Court does not consider any such "clarifications" to create a genuine dispute of

material fact.

## Evidentiary Challenges

"The principles governing admissibility of evidence do not change on a motion for

summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "Rule 56(e) provides

that affidavits in support of and against summary judgment 'shall set forth such facts as would be

*admissible in evidence*.'" *Id.* (quoting Fed. R. Civ. P. 56(e)).[36] "Therefore, only admissible

evidence need be considered by the trial court in ruling on a motion for summary judgment." *Id.*

(citing *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988); *United States v.*

*U.S. Gypsum Co.*, 340 U.S. 76, 85 (1950)); *see also In re Metro Affiliates, Inc.*, No. 02-42560,

2008 WL 656788, at *5 (Bankr. S.D.N.Y. Mar. 6, 2008) (explaining that in a motion for summary

judgment, "the underlying facts are required to be ones that would be admissible in evidence at

trial and shown through an affidavit by one competent to testify").

The Parties raised limited evidentiary objections to the materials submitted with the

Motions. First, the Trustee asks the Court to strike or disregard certain paragraphs of the Ingrassia

---

[36] The *Raskin* court was quoting a prior version of Fed. R. Civ. P. 56; substantially similar language now appears in Fed. R. Civ. P. 56(c)(4).

Declaration because they are "false" and barred by the sham affidavit doctrine.  Trustee Reply Memo. at 11–13.  Second, she asks the Court to strike statements in the Capstone Defendants' Motion regarding its audited financial statements and audit confirmation letters as hearsay and because they are "demonstrabl[y] false, and contradicted by the record in this case."  *Id.* at 13–17. Finally, she asks the Court to strike or disregard unspecified portions of the "Defendants' Motion Papers concerning Capstone's Proof of Claim" because they are contradicted by "formal judicial admissions";[37] because they are, like other testimony in that declaration, "false"; and the Court should exclude certain deposition testimony of Mr. Ingrassia and Ruth Abady, the Capstone Defendants' CFO, as hearsay.  *Id.* at 17–19.

The Capstone Defendants contend that the Court should strike the Macreery Affirmation because it is "filled with improper statements where Mr. Macreery tries to make factual assertions, or provide his own opinion as to the characterization of certain information or documents, to which (i) he clearly has no firsthand knowledge, and/or (ii) to which there is no direct citation to supporting admissible evidence."  Capstone Memo. at 55. The Capstone Defendants did not challenge the admission of the exhibits to the Macreery Affirmation.[38]  The Capstone Defendants also argue that the Court should exclude the Quintero Report because it fails to satisfy the *Daubert* standard.  Capstone Memo. at 36–52.

The Court need not resolve any of these challenges because no evidence that the Trustee seeks to exclude is material to resolving the Motions.  The only two sets of agreements relevant to determining whether the Accounts Receivable are property of the estate—the Costco Agreements

---

[37] An objection that a judicial admission contradicts testimony on summary judgment is not an evidentiary one. *Cf. Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (quoting 2 McCormick on Evid. § 254 (6th ed. 2006)).  For that reason, the Court will address the judicial admission argument in the following section.

[38] At the argument on the Motions, the Court resolved the objection by excluding the challenged portions of the affirmation, but not the exhibits to the affirmation.

and the SRA—are unambiguous.  Thus, because the Court does not consider extrinsic evidence in interpreting these agreements, the Trustee's evidentiary challenges are immaterial.

Whether a written contract is ambiguous is a question of law.  *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990); *GMAC v. Everett Chevrolet, Inc.*, 317 P.3d 1074, 1078 (Wash. Ct. App. 2014). [39]  Contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978); *see Luna v. Gillingham*, 789 P.2d 801, 804 (Wash. Ct. App. 1990) ("A written contract is ambiguous when its terms are uncertain or capable of being understood in more than one manner.").  For the reasons explained fully below, the relevant provisions of the Costco Agreements and SRA are unambiguous.  Accordingly, their meanings are not susceptible to challenge based on extrinsic evidence.  *Giancontieri*, 566 N.E.2d at 642 ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."); *Dice v. City of Montesano*, 128 P.3d 1253, 1258 (Wash. Ct. App. 2006) (holding that where a "contract is unambiguous . . . the trial court could grant summary judgment by interpreting the plain meaning of the agreement without resort to extrinsic evidence." (citing *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*, 911 P.2d 1301, 1310 (Wash. 1996))).  The Court will not resolve the Capstone Defendants' objection to the Quintero Report because the expert testimony contained therein is immaterial to the Court's resolution of the Motions; the matters relevant to summary judgment depend on nothing other than unambiguous provisions in the Costco Agreements and SRA.  *Cf. Pension Comm. Of Univ. of*

---

[39] The Costco Agreements are governed by Washington state law, while the SRA is governed by New York state law.

*Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 224 (S.D.N.Y. 2010)

("expert witnesses are not permitted to testify about issues of law").

### Judicial Admissions

Apart from her evidentiary objections, the Trustee argues that the Capstone Defendants are bound by the admissions contained in the Capstone Proof of Claim and, as a consequence, the Court should strike or disregard the Capstone Amended Claim and "the [Capstone] Defendants' Motion Papers concerning the [Capstone] amended proof of claim." Trustee Reply Memo. at 18–19. The Court does not do so.

A judicial admission is "a statement made by a party or its counsel which has the effect of withdrawing a fact from contention and which binds the party making it throughout the course of the proceeding." *Pillars v. GM LLC (In re Motors Liquidation Co.)*, 957 F.3d 357, 360 (2d Cir. 2020). "[I]n order for a statement to constitute a judicial admission it must not only be a formal statement of fact but must also be intentional, clear, and unambiguous." *Id.* at 361. Judicial admissions "are not evidence at all. Rather, they are formal concessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Hoodho*, 558 F.3d at 191 (quoting 2 McCormick on Evid. § 254 (6th ed. 2006)). Such admissions "are not subject to judicial scrutiny to ensure that the admissions are fully supported by the underlying record," *id.*, which promotes efficiency by "provid[ing] notice to all litigants of the issues remaining in dispute, identify[ing] those that can be eliminated from the case and those that cannot be, narrow[ing] the scope of discovery to disputed matters and thus reduc[ing] trial time," *id.* (quoting *Banks v. Yokemick*, 214 F. Supp. 2d 401, 405–06 (S.D.N.Y. 2002)).

The Trustee argues, in essence, that the Capstone Defendants should be precluded from explaining the large discrepancy between the original Capstone Proof of Claim and the significantly reduced Amended Proof of Claim based on, "all of the foregoing admissions contained in the original proof of claim." Trustee Reply Memo. at 17. She says that these admissions are "binding on the Capstone Defendants throughout the entire litigation unless modified or relieved in the discretion of the Court." *Id.* at 18 (citing Prince, *Richardson on Evidence* § 8-215 (11th ed. 1995); *Clason v. Baldwin*, 152 N.Y. 204 (1897); *Carnegie Steel v. Cambria Iron*, 185 U.S. 403 (1901)). She asserts that, because "[n]o application was made to withdraw or be relieved from the consequences of the original proof of claim," Capstone is bound by the original proof of claim's admissions, notwithstanding its amendment, since the original proof of claim was not withdrawn pursuant to Bankruptcy Rule 3006. Without citation to relevant authority, the Trustee asks the Court to "strike or disregard the amended proof of claim and the Defendants' Motion Papers concerning the amended proof of claim." Trustee Reply Memo. at 19. The Trustee does not specify which parts of the "Defendants' Motion Papers concerning the amended proof of claim" should be stricken, but based on the citations within the section, the Court interprets that the Trustee seeks to strike paragraphs 142 to 149 of the Ingrassia Declaration and paragraphs 110 to 117 of the Capstone Statement.

Those paragraphs of Mr. Ingrassia's Declaration explain the discrepancy as follows: the original claim was not an accurate representation of the debt owed by the Debtor to Capstone Capital under the SRA. Ingrassia Decl. ¶ 144. Instead, it was a comprehensive list of all charges and expenses related to the SRA, many of which were not actually the Debtor's responsibility. Ingrassia Decl. ¶ 145. Ingrassia claims that Capstone Capital should have shouldered many of these costs, including the cost of goods sold and various logistical expenses. *Id.* ¶ 148. Upon

25

realizing this error, Capstone Capital filed the Amended Claim, reducing the amount to $150,000. *Id.* ¶ 146. Mr. Ingrassia asserts that this adjustment was made to correct the mistaken inclusion of costs that should have been borne by Capstone Capital, not the Debtor. *Id.* ¶ 148.

The Trustee challenges this explanation, arguing that documentary evidence contradicts Ingrassia's statements. Trustee Reply Memo. at 17. The Trustee points to several pieces of evidence: the original Capstone Proof of Claim, which included costs charged to the Debtor; the rider to the Proof of Claim, which explicitly stated that the claim arose from advances and payments due from the Debtor under the SRA; and the Cash Collateral Motion, which referenced a substantial prepetition secured debt owed to "Capstone." *Id.* at 17–18. Based on this evidence, the Trustee contends that Ingrassia's explanation for the claim reduction is false. *Id.* at 17.

The Court rejects this challenge for two reasons. First and foremost, the amendment of a proof of claim "supersedes all other claims," and therefore earlier proofs of claim do not constitute judicial admissions. *In re Merrick*, 483 B.R. 236, 243 (Bankr. D. Utah 2012). "To find otherwise would severely curtail creditors' abilities to file amended proofs of claim in bankruptcy proceedings." *Id.*; *see In re Meier*, No. 14-bk-10105, 2014 WL 6686541, at *3 (Bankr. N.D. Ill. Nov. 24, 2014) (observing that Bankruptcy Rule 7015 "would supersede any 'admission' made on the proof of claim form'"). Indeed, the treatise on which the Trustee relies makes this same point (albeit with respect to pleadings under New York state law). Prince, *Richardson on Evidence* § 8-215 (11th ed. Supp. 2008) ("An application for relief against the consequences of a formal judicial admission is addressed to the discretion of the Trial Judge. Note, however, that a pleading may

once be amended without leave of the court, provided the amendment is made within the time

provided by CPLR 3025(a).").[40]

Second, to the extent that Trustee is arguing that record evidence contradicts Mr.

Ingrassia's testimony, the Court is not weighing Mr. Ingrassia's credibility on summary judgment.

Even if the Court could do so, Mr. Ingrassia's credibility is irrelevant to the Motions, which require

the Court only to decide to whom the Costco Agreements and the SRA give the right to the

Accounts Receivable. That question does not implicate whether Mr. Ingrassia offers a believable

explanation for the Capstone Amended Proof of Claim. Accordingly, the Court will not strike the

Capstone Amended Claim or the "Capstone Defendants' Motion Papers" concerning the amended

proof of claim.

## Factual Background

### The Parties

The Debtor is a limited liability company formed under the laws of the state of New York.

Stipulated Facts ¶ 15. Capstone Capital is a limited liability company formed under the laws of

the State of Delaware. *Id.* ¶ 28. Capstone Credit is a limited liability company formed under the

laws of the State of Delaware. *Id.* ¶ 29. The Capstone Defendants' main line of business is

factoring or purchase order financing. Capstone Statement ¶ 12.

In or around 2011, Capstone Capital started providing the Debtor with factoring and

purchase order financing services. *Id.* ¶ 1. On August 12, 2011, the Capstone Defendants filed an

"all assets" UCC-1 financing statement against the Debtor (the "2011 Financing Statement"). *Id.*

---

[40] The two cases that the Trustee cites to argue that the proof of claim's admissions are binding are inapposite. *Clason* dealt with a stipulation of facts, not an amended pleading. *Clason*, 152 N.Y. at 210–11. *Carnegie Steel* also dealt with the admissibility of a stipulation of fact that was later contradicted by eyewitness accounts. *Carnegie Steel*, 185 U.S. at 444.

¶ 2.  At the time, the Debtor was party to a "sales representative agreement" with Samsung C&T America, Inc. ("Samsung"), to produce apparel for retailers, including Costco Wholesale Group and its affiliates (collectively, "Costco").  Trustee Statement ¶ 23.  In July 2015, Samsung terminated its relationship with the Debtor.  *Id.* ¶ 26.  Thereafter, the Debtor approached the Capstone Defendants to replace Samsung with Capstone Capital.  *Id.* ¶ 27.  The Debtor and Capstone Capital intended to replicate the agreement that existed between Samsung and the Debtor.  Capstone Statement ¶ 6.  On October 29, 2015, Capstone Capital and the Debtor entered into the Sales Representative Agreement ("SRA") at issue in the Motions.  *Id.* ¶ 9.[41]

**The SRA and Costco Agreements**

Contemporaneously with the execution of the SRA, Capstone Capital and Costco entered certain agreements to produce garments for Costco known as the "Costco Agreements."  *Id.* ¶ 10. They consist of: (i) the Costco Wholesale Global Import Supplier Agreement, (ii) the Costco Wholesale Private Label Agreement, (iii) the Private Label and Dual Brand Addendum to Costco Wholesale Global Import Supplier Agreement, and (iv) the Vendor Purchase Program Agreement. *Id.*

Under the SRA, Capstone Capital appointed the Debtor as its exclusive "Sales Representative" under section 2(a) of the SRA, to market and sell products to third parties. *Id.* ¶ 23.  That section defined Level 8's responsibilities:

> Capstone hereby appoints Level 8 as its exclusive Sales Representative for the sale of Products to be purchased by Capstone and sold to customers (the "Customers") in the Territory. Level 8 hereby accepts such appointment and agrees to act as the same in accordance with the terms and conditions hereof.  Level 8 agrees to use its best efforts to conduct the following activities: sourcing and design of Products, quality control and factory monitoring, and promoting the sale of, and soliciting

---

[41] Capstone Credit was not a signatory to the SRA or the Costco Agreements.  Trustee Statement ¶ 14.  The SRA is annexed as Exhibit 9 to the Macreery Affirmation.

purchase orders from potential Customers of the Products in the Territory. As used herein, the term "exclusive" means that the Product transactions contemplated hereunder shall only occur by and through Level 8 and Capstone. This Agreement does not apply to any internet or e-commerce sales directly to consumers, or to any sales outside of the Territory, and any agreement between the Parties regarding such sales must be mutually agreed in a writing signed by both Parties.

SRA § 2.

The Costco Wholesale Global Import Supplier Agreement designated Capstone Capital as the "Supplier," Capstone Statement ¶ 32, and prohibited the factoring or assigning of receivables without Costco's express consent, which neither Capstone Capital nor the Debtor sought to obtain. *Id.* ¶ 33. By entering the Costco Agreements, Capstone Capital positioned itself as the "vendor of record" for Costco, thereby obtaining unique vendor identifiers and vendor portal access. *Id.* ¶ 11.[42]

Section 4(c) of the SRA confirmed—consistent with the Costco Agreements—that Capstone Capital owned all customer receivables, but the Debtor was required to forward any payments it received to Capstone Capital. *Id.* ¶ 25. That section says:

> All Customer receivables shall be and remain the sole property of Capstone. All invoicing shall be done by Capstone which shall provide for direct payment to Capstone in U.S. dollars. If any payment is directed to or otherwise received by Level 8, Level 8 shall hold such payment in trust for Capstone and forward it to Capstone within three days of Level 8's receipt, in the form received by Level 8. If Level 8 fails to forward such payment to Capstone as required, interest shall accrue on the amount of such payment at the rate of 18% per annum from the date of such receipt by Level 8 until such payment is transferred to Capstone. All Products purchased hereunder by Capstone shall be and remain the property of Capstone until delivered to the Customer (or at such other time as title transfers to the Customer pursuant to the agreed upon order terms and the Capstone invoice).

---

[42] This arrangement was unique for Capstone, considering that its primary business revolved around factoring and purchase order financing, not direct vendor operations. Capstone Statement ¶ 12.

SRA § 4(c).[43]

## **The Debtor's and Capstone Capital's Operations Under the Agreements**

### *The Bid Process*

The Debtor solicited purchase orders from Costco on behalf of Capstone Capital. Capstone Statement ¶ 47. Those efforts prompted Costco buyers to reach out to the Debtor requesting bids for the production and supply of specific goods, including certain styles of the Kirkland Signature branded outerwear collection. *Id.* ¶¶ 48–49. Typically, that led to discussions with Costco regarding the bid process. Representatives from Capstone Capital attended some of these meetings with Costco, particularly the initial engagements following the execution of the SRA. *Id.* ¶¶ 53–54.

The Debtor and Capstone Capital looked to manufacturers in Vietnam to supply the goods necessary to fill the bid. Accordingly, once they had the bid specifications, in preparing the bid, to calculate their production costs, they obtained pricing from Vietnamese factories, and considered other expenses, including shipping and return allowances, to decide on a bid price. *Id.* ¶¶ 55–56.

The Debtor submitted the bid to Costco. It included detailed pricing information for the goods subject to the bid, as well as product samples and a "tech pack." *Id.* ¶ 57. The "tech pack" detailed the technical specifications of the subject goods. The Debtor prepared the tech pack, and Capstone Capital reviewed it prior to submission to Costco. *Id.* ¶¶ 50–51.

---

[43] Section 4(d) of the SRA granted Capstone Capital a security interest in all the Debtor's assets. Capstone Statement ¶ 26.

If Costco accepted the bid, Costco issued a "green ink" master purchase order. *Id.* ¶ 61. Individual purchase orders were later issued for each specific Costco store as the goods became ready for shipment.  *Id.* ¶ 63.

### The Manufacture and Sales Processes

Following Costco's issuance of the "green ink," Capstone Capital issued purchase orders to Vietnamese manufacturers, and letters of credit with certain banks ensured payment to the manufacturers.  *Id.* ¶¶ 65–66.  These manufacturers were selected by Level 8.  Jean Paul Lucas Deposition Tr., 54:7–8, ECF No. 84-3.  As part of its due diligence, Capstone Capital met with representatives from certain factories in Vietnam that had previously manufactured goods sold to Costco prior to the SRA.  *Id.* ¶ 8.

Capstone Capital pledged certain collateral to the banks that issued the letters of credit.  *Id.* ¶ 69.  If disputes arose concerning a letter of credit drawdown, Capstone Capital was responsible for the review and authorization of payments.  *Id.* ¶ 68.

Once the goods were manufactured and ready for shipment, Capstone Capital oversaw the generation of invoices to Costco, reflecting the shipping and purchase order documentation from Level 8.  Trustee Statement ¶ 53.  The manufactured goods were either shipped to warehouses for subsequent delivery to the appropriate Costco store or distribution center or shipped directly to Costco's distribution points based on orders from the stores.  Capstone Statement ¶ 70.

The Debtor took responsibility for ensuring compliance with all import and export laws in relation to Capstone Capital's product transactions and saw that imported goods for Costco's orders were properly classified for tax and duty purposes.  *Id.* ¶¶ 28–29.

Capstone Capital was responsible for collecting the receivables for specific accounts and maintained access to a vendor maintenance portal hosted by Costco. *Id.* ¶¶ 72–73. This portal contained details of each invoice including amount and type of units, store information, as well as invoice and purchase order numbers, amounts due, and the dates of invoices and purchase orders. *Id.* ¶ 74. Additionally, the portal held data on pending purchase orders, payment details, and deductions made by Costco. *Id.* ¶ 75. Costco made payments on account of these invoices (reduced by any deductions by Costco), directly to the Capstone Defendants. *Id.* ¶ 76. Capstone Capital copied the data from the Costco vendor portal to Capstone Defendants' internal systems for each batch of invoices generated. *Id.* ¶¶ 78–79. The information was imported to an Excel spreadsheet and uploaded to the Capstone Defendants' internal software. *Id.* ¶ 79.

### Tracking the Accounts Receivable and Commissions Payable Under the SRA

When transferring accounts receivable information from the Costco vendor portal to the Capstone Defendants' internal tracking software, the Debtor sent a "Confirmatory Schedule of Assigned Accounts Receivable" to the Capstone Defendants for each batch of invoices. *Id.* ¶¶ 82–83. Level 8 confirmed all purchase orders and every invoice for every garment sold via these schedules. Level 8 signed each schedule and gave it to Capstone Credit. Trustee Statement ¶ 55. In turn, the Capstone Defendants forwarded the documents to their accounting department. The transmittal forms contained detailed information about the invoices such as aggregate amounts, dates, discounts, supporting documents, and batch numbers. Sometimes they included special marks made by the Capstone Defendants to instruct their accounting department on how to treat fees, advances, and bookkeeping. Capstone Statement ¶¶ 85–86; *see* Confirmatory Schedule of Assigned Accounts Receivable Form, Ingrassia Decl., Ex. 26. For their dealings with the Debtor,

the Capstone Defendants used pre-existing forms and did not create new ones tailored to its relationship with the Debtor under the SRA.  Capstone Statement ¶ 89.

Under the SRA, Level 8 earned commissions based on the Net Invoice Amount minus LDP Costs and Capstone Capital's Overhead.  SRA § 7(a).  Per the SRA, these "Commissions" are calculated monthly, could be paid out to Level 8 or held in reserves, and Level 8 could receive advances on the Commissions.  *Id.*  Capstone Capital was entitled to apply Commission Reserves against amounts Level 8 owed Capstone Capital, and no interest was required to be paid on the reserves.  SRA § 7(b).  Specifically, Level 8's Commissions were calculated by taking the Net Invoice Amount, subtracting the LDP Cost for the shipment of Products covered by an invoice, and then subtracting Capstone Capital's Overhead.  *Id.* § 7(a).  The "Commission amount [was] calculated on a monthly basis accumulatively from the beginning of each calendar year to the end of the calendar month at issue."  *Id.*

Any Commissions owed to Level 8 were required to "be paid by the 10th day of each month following the month at issue or as otherwise agreed to between Capstone [Capital] and Level 8." *Id.*  The Commission amount was to be either distributed directly to Level 8 or "added and held in the Commission Reserves."  *Id.*  The SRA entitled Level 8 to receive "Advance Commission at such times and in such amounts as may be agreed upon, from time to time."  *Id.*

Capstone Capital had the right "to set off and apply any amount of the Commission Reserves with any amounts owed by Level 8 to Capstone [Capital]."  *Id.* § 7(b).  Furthermore, "no interest shall be payable on Commission Reserves."  *Id.*

In practice, each month, the Debtor requested an advance against the forecasted commission associated with a specific Costco sale program.  Capstone Statement ¶ 92.  Capstone Capital created monthly commission statements that tracked these advances against the projected

commission for the Debtor. It sent those statements to the Debtor for reconciliation. *Id.* ¶ 95. These statements also tracked the expenses incurred by Capstone Capital throughout the Costco sales programs. *Id.* ¶ 96. Capstone Capital also reconciled Costco's deductions and offsets with the monthly commission statements, matching the remittance advice provided to the Capstone Defendants when Costco processed invoice payments. *Id.* ¶ 97. It provided an annual consolidated commission statement, detailing monthly information and other relevant data from the monthly statements. *Id.* ¶ 99. This annual statement was used for end-of-year reconciliation with the Debtor to determine if surplus commissions were owed to the Debtor or if Capstone Capital had overpaid it. *Id.* ¶ 100.

The SRA provided that "no purchase orders for orders to be shipped to Customers will be accepted by Capstone [Capital] unless credit is approved by a factor or credit insurance company or unless the order is guaranteed by Level 8 or on a C.O.D., letter of credit, credit card, or other basis acceptable to Capstone [Capital] in its sole discretion." SRA § 4(b). Thus, following the execution of the SRA, and for purposes of the 2016 Costco sale program, Capstone Capital engaged a third party to assist with opening letters of credit for the cost of goods sold to Costco, and to assist in overseeing the logistics of shipping goods from Vietnam to the United States. Capstone Statement ¶ 101.

Level 8 assisted Capstone Capital in creating the provisions for the letters of credit, using the same letter of credit form as used by Samsung under its prior arrangement with Level 8. Frank Spadaro provided Joseph Ingrassia with the letter of credit draw-down language, *id.* ¶ 48, while Mr. Ingrassia added limitation of liability language providing that the beneficiary of the letter of credit waived all actions or claims against the applicant, *id.* ¶ 49. These provisions existed in all

the initial letters of credit, which totaled $18,260,989.50, and were intended to facilitate the production of existing confirmed outerwear orders of approximately $25,000,000.  *Id.* ¶¶ 48, 50.

Once the letters of credit were issued and the garments were ready for shipment, Capstone Capital arranged for invoices to be created based on shipping and purchase order documentation supplied by Level 8.  *Id.* ¶ 53.  The manufacturers provided beneficiary letters to obtain payment under the letters of credit for the garments sold to Costco under the SRA.  *Id.* ¶ 54.

However, there were issues with this third-party arrangement; these issues included shipping delays from Vietnam, the third-party's domestic warehouse and delivery service's struggles with handling the unit volumes, and the third-party's failures to meet Costco's truck-loading requirements, leading to late or rejected deliveries.  *Id.* ¶¶ 102–05.  These complications resulted in many unexpected chargebacks from Costco.  *Id.* ¶ 106.

## The Parties' Arguments on Summary Judgment

### *The Trustee's Motion*

The Trustee asserts that she is entitled to summary judgment on all the claims demanded by the Complaint.  Central to the Motion is her contention that the SRA is a disguised loan and financing agreement, pursuant to which the Capstone Defendants financed the Debtor's purchases of the goods needed to fill the Costco orders.  She says that Capstone Capital is an unsecured creditor with an unperfected security interest in the Accounts Receivable, and thus has no interest in the proceeds of the Accounts Receivable.

As support for that argument, she points to the SRA and evidence extrinsic to the SRA. First, she points to the terms of the SRA, wherein:

- The economic risk of loss fell on Level 8, and Capstone Capital enjoyed the benefits of a lender. Trustee Reply Memo. at 2. Therefore, the Court must consider the SRA as a financing agreement as a matter of law. *Id.* at 2.

- The SRA also provides that if collections on the Costco receivables did not suffice to pay the costs, expenses, and advances, then section 15(b) of the SRA would require Level 8 to pay Capstone Capital the negative balance on the Commission Statements, rendering Capstone Capital with a right of full recourse against Level 8. Trustee Memo. at 9.[44]

- Under the SRA, the Debtor had to fulfill all responsibilities typical of a seller of goods, such as sourcing, designing, marketing, and selling trademarked products, ensuring quality control and factory monitoring, and indemnifying Capstone Capital for any liabilities, fees, or expenses related to the business contemplated by the SRA. *Id.* at 2. Capstone Capital, on the other hand, was responsible for "financing" activities, which included managing accounts receivable, creating monthly commission statements that accounted for the business's costs and expenses under the SRA, and paying itself a commission of 7.5% of the gross sales. *Id.* at 2. Additionally, Capstone Capital carried out regular reviews of production costs and the financial performance of the Debtor's business. *Id.*

She also relies on evidence extrinsic to the SRA, including:

- That internal memos and communications with third parties, including account debtors, by both the Capstone Defendants and the Debtor, referred to "Capstone" as a "factor," and described their business under the SRA in financing terms. *Id.* at 3.

---

[44] That section provides:

At the end of the Disposal Period, Capstone shall charge any Product remaining in Capstone's inventory in an amount equal to the LDP Cost of such Product plus Capstone's Overhead to Commission Reserves. At the end of Accounts Receivable Collection Period, Capstone shall charge any accounts receivable remaining uncollected to Commission Reserves. If the Commission Reserves after the end of the Accounts Receivable Collection Period and Final Calculation is negative, Level 8 shall pay the negative amount to Capstone within ten (10) business days thereafter. If the Commission Reserves after the end of the Accounts Receivable Collection Period and Final Calculation is positive, Capstone shall pay such positive amount to Level 8 within ten (10) business days thereafter. However, if Capstone determines that future chargebacks, including but not limited to returns, discounts, or markdowns are expected, Capstone may postpone, in whole or in part, such final payment of Commissions, if any is due, up to a maximum of ninety (90) days from the Final Calculation.

SRA § 15(b).

- That the business conducted under the SRA was accounted for and depicted as financing in the Capstone Defendants' audited financial statements. *Id.*

- That in letters of credit and Beneficiary's Letters with outerwear manufacturers who produced goods sold to Costco, the Capstone Defendants insisted that their relationship with Level 8 be treated exclusively as a financing arrangement, rather than as a seller of goods. *Id.*

- That the Debtor and Capstone Capital used so-called Confirmatory Schedules of Assigned Accounts Receivable, to effect the provisions of the SRA. *Id.*

- That in the hearing held on the Debtor's cash collateral motion, Capstone referred to itself a creditor holding unperfected security interests in all the Debtor's assets. *Id.*

- That the so-called Legacy Order transactions involved the sale of Tahari trademarked outerwear, where only Level 8 could have acted as the seller. *Id.* at 2–3.

Finally, the Trustee relies on an argument that the prior agreement between Samsung and Level 8 was based on a sales representative agreement that is virtually identical to the SRA at issue here. *Id.* at 18–19. The Trustee says that in the complaint filed by Samsung in the action entitled *Samsung C&T America, Inc. v. Tommy Bahama Grp., Inc.*, 20-cv-10348 (S.D.N.Y.), Samsung asserted that its nearly identical form of SRA was a financing agreement. *Id.*

### The Capstone Defendants' Motion

The Capstone Defendants contend that they are entitled to summary judgment dismissing all the claims demanded in the Complaint. They deny that the SRA is a disguised loan and financing agreement and that they hold an unperfected security interest in the Accounts Receivable. They assert that the SRA is unambiguous and provides that Level 8 is acting as Capstone Capital's "sales representative" and that the receivables generated in connection with the SRA are the property of Capstone Capital. Capstone Memo. at 20–21.

The Capstone Defendants also contend that if the Court finds the SRA to be ambiguous, there is ample extrinsic evidence that supports their interpretation of the agreement. *Id.* at 23. They argue that the most compelling extrinsic evidence supporting their interpretation of the SRA are the Costco Agreements, entered into simultaneously with the SRA, which explicitly establish Capstone Capital as the "Supplier" and detail the relationship as one primarily between Capstone Capital and Costco, with the Debtor merely designated a "Subcontractor" without any rights under the Costco Agreements. *Id.* at 25–27. They say that the Costco Agreements not only demonstrate the direct nature of Capstone Capital's relationship with Costco, including requirements such as obtaining Costco's consent for any factoring or assignment of receivables (a consent never sought), securing commercial general liability insurance for Costco's benefit, and indemnifying Costco— but also firmly position Capstone Capital as the vendor of record, responsible for all acts of the Debtor, and underscoring the relationship that supports the Capstone Defendants' interpretation of the SRA. *Id.*

## Discussion

The central issue in resolving the Motions is whether the Accounts Receivable are property of the estate under section 541 of the Bankruptcy Code. That is the subject of the Second Issue.[45] Whether the Accounts Receivable are Debtor's property turns on whether the Debtor has an interest in the Accounts Receivable under state law. *Butner v. U.S.*, 440 U.S. 48, 55 (1979) (state law creates and defines property interests "unless some federal interest requires a different result"); *see also In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1101 (2d Cir. 1990) ("Although

---

[45] As stated earlier, the Second Issue is:

Did the terms of the SRA and the related agreements provide the Debtor with an interest in the goods produced and accounts receivable generated under the SRA, or rather, were all goods produced and accounts receivable generated under the SRA at all times the sole property of the Capstone Defendants?

federal bankruptcy law determines the outer boundary of what may constitute property of the estate, state law determines the 'nature of a debtor's interest' in a given item. . . .  Therefore, whereas federal law instructs us that [something] may constitute property of [the] estate, state law determines whether [the debtor]'s interest in the [thing] is sufficient to confer on the estate a property right." (quoting *In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989))).

The Parties argue who owned the Accounts Receivable largely by reference to the SRA, but hold opposite views on the effect of the SRA on the Debtor's and Capstone Capital's respective rights to the accounts receivable generated by Costco.  The Capstone Defendants say that section 4(c) of the SRA—which provides, in part, that "[a]ll Customer receivables shall be and remain the sole property of Capstone"—grants Capstone Capital the right to the Accounts Receivable "from their inception." Capstone Opposition Memo. at 12.  The Trustee disagrees and argues, in essence, that the SRA could not vest Capstone Capital with ownership of receivables that did not yet exist. Trustee Reply Memo. at 6.

The Trustee is correct that Capstone Capital could not have owned receivables that did not yet exist.  However, once the Accounts Receivable came into existence, the Debtor could not have assigned them to Capstone Capital if it did not own them.  For this reason, as the Capstone Defendants have correctly noted, the threshold issue is who owned the Accounts Receivable at "their inception."  *See* Capstone Memo. at 10.  The Accounts Receivable were generated from sales to Costco.  To determine what interest, if any, the Debtor had in the Accounts Receivable, the Court must first determine who had the right to be paid by Costco.

The Costco Agreements "memorialize the relationship between Costco and Capstone Capital." *See* Capstone Opposition Memo. at 17.  The transactions contemplated by the SRA were governed by the Costco Agreements.  To determine who, between the Debtor and Capstone

Capital, Costco was obligated to pay for the goods delivered to Costco, the Court interprets the Costco Agreements using ordinary principles of contractual interpretation. *Atkins v. Praxair Inc.*, 182 F. App'x 724, 727 (unpublished) (9th Cir. 2006) (explaining under Washington law, "[w]hen a contract is unambiguous, courts must enforce its terms according to their plain meaning" (citing *Syrovy v. Alpine Res., Inc.*, 859 P.2d 51, 54 (Wash. 1993))).

Under section 6.1 of the Costco Wholesale Global Import Supplier Agreement, Capstone Capital had the right to payment for goods sold under the agreement. That section, titled "Payment and Retainer Terms," states that "[p]ayment and any specific retainer terms are set forth in Attachment A." Costco Wholesale Global Import Supplier Agreement at 1, ECF No. 124-1. Attachment A, in turn, specifies the payment terms as "NET 70 DAYS ROG," and the only signatories to those payment terms are Capstone Capital and Costco.

Under the Costco Wholesale Private Label Agreement, Capstone Capital and Costco agreed that Capstone Capital would be the non-exclusive private label manufacturer for certain products. Costco Wholesale Private Label Agreement § 1, ECF No. 124-2. That agreement details the responsibilities of Capstone Capital in producing and delivering private label products to Costco. Both Capstone Capital and Level 8 were signatories to this agreement. However, Capstone Capital signed the agreement as the "Vendor" and Level 8 signed it as the "Subcontractor." The agreement not does not provide that the Subcontractor has a right to payment by Costco. *See id.* at 4. Rather, section 2.1 of the Private Label Standard Terms, which are incorporated into the Costco Wholesale Private Label Agreement, clarifies that "[a]ll sales of the Products shall be between Vendor as seller and Costco Wholesale as buyer." Costco Wholesale Private Label Standard Terms § 2.1, ECF No. 124-2.

Section 4.1 of the Costco Wholesale Private Label Standard Terms, titled "Payment," states that "[p]ayment shall be on the terms stated in Annex A to the Private Label Agreement, or as otherwise agreed in writing between the parties." *Id.* § 4.1, ECF No. 124-2. Annex A is executed by Capstone Capital and Costco and references the "Order Confirmation Sheet" for pricing and terms. Although no "Order Confirmation Sheet" is attached to Annex A, at least two documents labeled "order confirmations" exist in the record, which are what the Parties refer to as the "Green Ink Samples." The first Green Ink Sample, dated October 28, 2016, designates the Vendor as Capstone Capital and is addressed from Costco to Richard Aloisi, who was the vice president of Level 8. The second, dated October 4, 2016, designates the "Company Name" as "Capstone / Level 8" and is again addressed from Costco to Richard Aloisi.

Though Level 8 is designated together with Capstone in the "Company Name" field of a Green Ink Sample, it was not entitled to payment by the Costco Wholesale Private Label Agreement for this fact. Rather, its right to payment, and indeed any of Level 8's rights under that agreement, are expressly rejected by section 14 of that agreement, titled "Subcontractor Undertakings," which specifies:

> By signing below, [Level 8] agrees and undertakes that, as part of its agreement with Vendor, it will comply with all obligations (BUT WILL NOT HAVE ANY RIGHTS) of [Capstone Capital] in the Private Label Standard Terms and the Costco Wholesale Vendor Code of Conduct.

Costco Wholesale Private Label Agreement § 14, ECF No. 124-2. This provision forecloses application of section 2.1 of the Private Label Standard Terms ("[a]ll sales of the Products shall be between Vendor as seller and Costco Wholesale as buyer") to Level 8.

This conclusion is reinforced by section 2.4, titled "Contract For Sale," in the Private Label Standard Terms, which addresses the effect of any inconsistencies between a Purchase Order and

the so-called "Private Label Documents" (which include the Private Label Standard Terms).  That

section provides:

> No contract for sale shall be formed until Costco Wholesale issues a Purchase
> Order.  Issuance of a Purchase Order constitutes an acceptance by Costco
> Wholesale of Vendor's offer to sell and creates a binding contract for sale.  Each
> Purchase Order shall be deemed a separate contract subject to the terms of that
> Purchase Order and the Private Label Documents, and not part of an Installment
> contract.  In case of any conflict between any Purchase Order and the Private Label
> Documents, the terms of the Purchase Order as to quantity, price, and shipment will
> govern but as to all other terms the Private Label Documents will govern.

Costco Wholesale Private Label Standard Terms § 2.4, ECF No. 124-2. This provision clarifies

that even if a Purchase Order stated that the Vendor were "Capstone Capital / Level 8," that fact

would not make Level 8 a "seller" under section 2.1 of the Private Label Standard Terms.  Under

the Costco Agreements, the Accounts Receivable belong to Capstone Capital.

Although the Trustee argues that the nature of the SRA is akin to a financing agreement,

rather than a so-called sales representative agreement, she does not contend that the terms of the

SRA are themselves ambiguous.   Section 4(c) is unambiguous; it cannot be read to transfer

ownership of the Accounts Receivable from Capstone Capital to Level 8.  The Trustee has not

pointed to any provision of the SRA that effects a transfer of the receivables to the Debtor.  Thus,

the Accounts Receivable never became the Debtor's property, and they likewise are not property

of the Debtor's estate.

Finally, the Court rejects the Trustee's argument that because the prior agreement between

Samsung and Level 8 was based on a sales representative agreement that is virtually identical to

the SRA at issue here, and because Samsung asserted that its nearly identical form of SRA was a

financing agreement in another action, that means that the Trustee must prevail.  First, that

argument is not responsive to the ultimate issue of to whom the Accounts Receivable belong.

Second, the Trustee has not demonstrated that the agreement at issue in that case is identical to the

one here, much less cited to where it was filed on the docket in the other action.  The Trustee has

also failed to offer a reason why that admission is binding on the Capstone Defendants, who were

not parties to that action.

For these reasons, the Court resolves the Second Issue "no," in part, as to the first half, and

"yes," in part, as to the second half: the terms of the SRA and the "related agreements" did not

provide the Debtor with an interest in the accounts receivable generated under the SRA, and

accounts receivable generated under the SRA were the sole property of the Capstone Defendants.[46]

For those same reasons, the Court resolves the Third Issue[47] "no": the SRA is not an agreement

for the absolute sale and assignment of contract rights and accounts receivable created in the future

by the Debtor subject to Article 9 of the UCC.

The Court now considers the First Issue identified by the Parties.[48]  The Trustee argues that

the Court should treat the SRA as a financing agreement because under the SRA, Level 8—not

Capstone Capital—bore the risks associated with the ownership of the goods and receivables.  *See*

Trustee Memo. at 5–7.  Although the Trustee does not clearly identify the legal foundation for her

view that risk allocation affects the ownership of the Accounts Receivable, the Trustee cites to

---

[46] The Court does not answer whether the SRA and the related agreements provided the Debtor with an interest in the goods produced under the SRA, or whether they were the sole property of the Capstone Defendants; that issue is not implicated by the Motions.

[47] As stated earlier, the Third Issue is:

Is the SRA an agreement for the absolute sale and assignment of contract rights and accounts receivable created in the future by the Debtor, subject to the provisions of Article 9 of the UCC?

[48] As stated earlier, the First Issue is:

Was the SRA, along with the related agreements executed in connection therewith, a form a [sic] financing agreement between the Debtor and the Capstone Defendants that had to be perfected under Article 9 of the New York Uniform Commercial Code, or rather, did the SRA form that of a service relationship between the Debtor and the Capstone Defendants, whereby the Debtor acted on the Capstone Defendants' behalf?

cases suggesting that some possible bases include (i) factors that courts use to classify a transaction as a sale or loan, (ii) state-law usury cases, or (iii) some other equitable basis for finding that the Accounts Receivable should be characterized as belonging to the Debtor.  For the reasons explained below, these first two bases do not respond to the fact that the Accounts Receivable never belonged to the Debtor.  The third is inconsistent with the Court's recharacterization authority.

The Trustee emphasizes that the substance of an agreement, not its title or description, determines its nature.  *Id.* at 5–6 (citing *Quackenbos v. Sayer*, 62 N.Y. 344 (1875); *Hall v. Eagle Ins. Co.*, 136 N.Y.S. 774 (App. Div. 1912), *aff'd*, 211 N.Y. 507 (1914); *Endico Potatoes v. CIT Group/Factoring*, 67 F.3d 1063 (2d Cir. 1995)).  She refers to a multi-factor framework to classify transactions as sales or loans, which frameworks consider the right of recourse against the seller, whether the seller services accounts and commingles receipts, independent investigation by the buyer, and the seller's rights to excess collections, among other factors.  *Id.* at 6 (citing *CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797 (Bankr. D. Mont. 2021); Robert D. Aicher and William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181 (Winter, 1991) (the "Aicher-Fellerhoff Article")).

The Trustee applies these factors to provisions of the SRA and contends that they suggest that the SRA is a financing agreement.  *Id.* at 7–9.  She points to Level 8's obligations under the SRA, including the performance of all work in the sales process for Costco orders and the assumption of various risks and costs.  *Id.*  The Trustee notes that Capstone did not substantially participate in the sales process and that the SRA placed obligations on Level 8 typically associated with a borrower in a loan arrangement, including full recourse rights for Capstone Capital.  *Id.* at

44

8–10.  Finally, the Trustee discusses how Capstone Defendants' financial statements referred to the SRA.  *Id.* at 15.  She cites instances where the relationship was described in terms of financing, and notes that the Capstone Defendants' financial statements, when accounting for the business with Level 8, treated the business as financing receivables, rather than sales.  *Id.* at 15–17.

The Capstone Defendants argue that the Trustee misplaces her reliance on the Aicher-Fellerhoff Article and its application in *In re Shoot the Moon*.  Capstone Opposition Memo. at 27.  They say that the framework endorsed by the article is employed in considering whether a transaction is a sale or a loan, which is not the question at hand in this case.  Rather, the SRA was an agreement for the engagement of the Debtor as Capstone Capital's sales representative; the goods and accounts receivables generated under the SRA were always the sole property of Capstone Capital.  *Id.*  Moreover, the Capstone Defendants assert that none of the cases that the Trustee cites address whether a sales representative agreement, like the SRA, is a disguised financing agreement.  *Id.* at 28.  They say those cases focus on whether transactions constitute true sales or merely create secured interests in accounts receivable.  *Id.* (citing *In re Sterling Optical Corp.*, 371 B.R. 680 (Bankr. S.D.N.Y. 2007); *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995); *S & H Packing & Sales Co. v. Tanimura Distrib., Inc.*, 883 F.3d 797 (9th Cir. 2018); *In re Dryden Advisory Grp., LLC*, 534 B.R. 612 (Bankr. M.D. Pa. 2015)).

The Capstone Defendants are correct.[49]  In *In re Shoot the Moon*, the United States Bankruptcy Court for the District of Montana, applying the factors set out in the Aicher-Fellerhoff Article, distinguished between true sales of accounts receivable and disguised loans.  635 B.R. at

---

[49] Although the Parties frame the issue as one of the nature of the SRA, that framing is not responsive to the real issue at hand: whether the Accounts Receivable are property of the estate.  For that reason, it does not matter whether the SRA is more like a "financing" or "servicing relationship," which terms have no independent legal significance here.  What matters is who owns the Accounts Receivable.

812–14.  The case centered on a series of transactions between CapCall and various Shoot the Moon debtor entities, ostensibly structured as purchases of accounts receivable.  *Id.* at 812.

In applying this test, the court focused on the language of the transaction documents, UCC-1 financing statements, and the parties' course of conduct.  *Id.* at 814–820.  Though acknowledging that some evidence favored CapCall's position that the transactions were sales, such as reconciliation provisions and the absence of fixed terms, the court concluded that the weight of the evidence demonstrated these were disguised loans.  *Id.* at 819–20.  The court dismissed the agreements' explicit statements that the transactions were not loans as "conclusory and self-serving," and looked beyond the form of the transaction to its substance.  *Id.* at 819.

The Trustee asks the Court to look "beyond the form," as did the court in *In re Shoot the Moon*, to find that the Accounts Receivable belong to the Debtor.  She does so without acknowledging that she is asking the Court to make an interpretive leap that the case does not support.  There, the court was asked to look beyond the form of the transaction documents to determine that, despite calling the transaction something else, it was actually a loan.  *In re Shoot the Moon*, 635 B.R. at 819–20.  Here, the Court is being asked to look beyond the form of the Costco Agreements and the SRA to find that the Debtor always owned or should be treated as having owned the Accounts Receivable on whose behalf Costco was obligated to pay Capstone Capital.  These requests are clearly not analogous.

In *In re Shoot the Moon*, it was undisputed that the receivables were, in the first instance, the debtor's property to sell or lease.[50]  In contrast, that is the very dispute here.  The object of the

---

[50] Specifically, there was no dispute that the receivables generated through the debtor's operations were, at their inception, owned by the Shoot the Moon entities prior to the transactions with CapCall.  Instead, the heart of the dispute was whether the transactions at issue were true sales—thus transferring ownership of the receivables to CapCall, or loans—where the debtor would have owned the receivables subject to CapCall's security interest.

Motions is to determine whose property, as between the Debtor and the Capstone Defendants, the Accounts Receivable are. That question cannot be answered by the test applied by the court in *In re Shoot the Moon*, because that test assumes the transaction to be characterized involved the Debtor's own property. Even if the factors set out in the Aicher-Fellerhoff Article and *In re Shoot The Moon* were applicable, those factors are not grounded in any particular state's law, and the Court cannot simply assume that they apply here. *Butner*, 440 U.S. at 54 ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); *cf. Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("There is no federal general common law.").

The Aicher-Fellerhoff Article does, however, make clear that the SRA's effectiveness did not require perfection under Article 9 of the New York Uniform Commercial Code. The Trustee quotes the article for the proposition that "[t]he provisions of article nine of the U.C.C. explicitly encompass both sales of accounts receivable and security interests in receivables. . . . the U.C.C. defines a 'security interest' as 'any interest of a buyer of accounts.' Thus, 'even an outright buyer of accounts . . . by definition has a 'security interest' in the accounts which it purchases.'" Robert D. Aicher and William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181, 184 (1991) (citing U.C.C. § 1-201(37) (1990); *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 542 (3d Cir. 1979)). The Capstone Defendants could not have bought accounts receivable from Level 8 that Level 8 did not own. For this reason, the Court answers the First Issue in the negative, to the extent that the SRA did not require Capstone Capital to perfect its own interest in the receivables contemplated by that agreement.

Next, the Trustee cites to, and appears to rely upon, cases demonstrating that under New York law, courts may recharacterize transactions to reflect their true "nature," rather than

conceding to the labels that parties assign them.  However, these cases, which generally state that a court will look beyond the form of a contract to determine if it is usurious, are meaningfully distinguishable.[51]  For one, the Trustee has not demonstrated that under New York law, courts would apply a principle that "[t]o determine whether a transaction is usurious, courts look not to its form but to its substance or real character," *Blue Wolf Cap. Fund II, L.P. v. American Stevedoring, Inc.*, to transactions other than those that are alleged to be usurious.  961 N.Y.S.2d 86, 89 (N.Y. App. Div. 2013).  The purpose of this recharacterization doctrine, under New York law, does not appear so abstract or broad as to support the argument that a court may intervene to recharacterize transactions where one party assumed certain risks while the other party reaped the benefits.  Instead, recharacterization prevents a party from evading the state's usury laws by tailoring an agreement whose form seems to comply with those laws but whose effect is to flout them.  *See Brown v. Robinson*, 120 N.E. 694, 698 (N.Y. 1918) ("If a deduction be made professedly for such a purpose, but really as a mere pretense and cover and with the intent to secure illegal

---

[51]  The Trustee's non-usury cases are also meaningfully distinguishable.  In *Endico Potatoes v. CIT Group/Factoring*, the court recharacterized a transaction as a secured loan rather than a purchase of accounts receivable in a PACA case under general trust principles because PACA trusts are "governed by general trust principles."  67 F.3d 1063, 1067 (2d Cir. 1995).  The Trustee's invocation of the "predominant purpose test," as explained in *Babcock & Wilcox Co. v. Cormetech, Inc.*, is inapposite.  There, the court explained that "[w]hen a contract is a mixed contract for goods and services, Ohio courts use the predominant purpose test to determine whether the contract is for the sale of goods or services; if the contract is for services the UCC does not apply."  168 F. Supp. 3d 1017, 1024 (N.D. Ohio 2016); *vacated and remanded on other grounds*, 848 F.3d 754 (6th Cir. 2017).  However, as the Trustee's citation to *Ditech Co. v. Osirius Group, LLC* demonstrates, this test has no application to the Trustee's argument that the SRA is a *financing agreement* governed by Article 9 of the UCC because "Article 2 of the UCC only governs contracts for goods."  2017 WL 6039557 (E.D. Mich. Dec. 6, 2017); *accord* N.Y. U.C.C. Law § 2-102 ("Unless the context otherwise requires, this Article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction.").  Thus, the Court sees no need to answer whether the SRA "form[ed] that of a service relationship."

interest, the act will produce usury."). The Trustee's usury cases are distinguishable for this reason.[52]

Bankruptcy Courts also have recharacterization authority, at least for purposes of administration of estate assets. *See In re Lyondell Chem. Co.*, 544 B.R. 75, 93 (Bankr. S.D.N.Y. 2016) (observing that "there can be little doubt that bankruptcy courts have the power to recharacterize debt as equity when such is warranted by the facts"). As the Third Circuit has explained, bankruptcy courts have authority, under section 105(a) of the Bankruptcy Code, to decide the true nature of a financial transaction to determine whether it should be treated as a debt or an equity investment. *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454–55 (3d Cir. 2006).[53] Still, as it relates to claims, it is clear that one of the primary purposes of recharacterization is to allow

---

[52] The Trustee's usury recharacterization cases are also factually dissimilar from the uncontested facts here. For example, in *Hall v. Eagle Ins. Co.*, the Appellate Division, First Department, explained that under New York law, transactions that are sales on their face but are in substance loans that may be recharacterized accordingly. 136 N.Y.S. 774, 783 (App. Div. 1912), *aff'd sub nom Hall v. Eagle Ins. Co. of London, England*, 105 N.E. 1085 (N.Y. 1914). The plaintiff inherited a vested interest in his late father's estate, subject to his mother's life estate. *Id.* at 776–77. Facing financial difficulties, the plaintiff sought a loan against his interest in the estate and entered an agreement with the defendant wherein the plaintiff was paid $15,500 upfront, with an obligation to pay $34,500 upon his mother's death or remarriage, secured by a mortgage on his estate interest and a bond. *Id.* at 777. Despite the transaction's form as a property transfer, the court concluded that it was essentially a loan, because it involved an advance of money to be repaid from the plaintiff's property without transfer of the property. *Id.* at 778–79. Of course, this bears little relation to the issues at hand since the Debtor could not have sold receivables to the Capstone Defendants that it did not own. Nor is the Trustee's reliance on *Quackenbos v. Sayer* apposite. There, again, the court said that the true character of a financial transaction, rather than its outward form, determines its legality with respect to usury laws. *Quackenbos*, 62 N.Y. at 347. The case involved a plaintiff who nominally sold railroad bonds to the defendant's son at an inflated price, knowing that the bonds were needed only to secure a loan were unconnected to actual ownership or investment. *Id.* at 344–45. The court found this arrangement to be a usurious disguised loan and not a genuine sale since it effectively charged an interest rate higher than legally allowed. *Id.* at 347.

[53] There is some implicit conceptual disagreement over what the object of recharacterization is—a claim, *see In re: Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 232 (4th Cir. 2006), a transaction, or the agreement itself, *see Matter of Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir. 1991). The Ninth Circuit's decision in *In re Fitness Holdings Intern., Inc.* suggests that these distinctions are not meaningful, since a "claim" is a "right to payment," and whether a claimant has a right to payment must be determined by reference to state law under *Butner.* 714 F.3d 1141, 1147 (9th Cir. 2013). In determining whether to recharacterize claims from debt to equity, this Court has typically followed the Third Circuit's approach as it outlined in *In re SubMicron Sys. Corp.*, which is "grounded in bankruptcy courts' equitable authority to ensure 'that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'" 432 F.3d at 454 (quoting *Pepper v. Litton*, 308 U.S. 295, 305 (1939)). *E.g., In re Lyondell Chem. Co.*, 544 B.R. 75, 93 (Bankr. S.D.N.Y. 2016); *In re Live Primary, LLC*, 626 B.R. 171, 191 (Bankr. S.D.N.Y. 2021). This approach calls for courts to apply an eleven-factor test to determine whether a claim for debt for should be recharacterized as equity.

the court to determine whether the transaction underlying a claim is debt or equity at the outset so that what is truly an equity contribution cannot jump the line of distribution priority by disguising itself as debt. *Dornier Aviation*, 453 F.3d at 231.

This line of authority has no application here for two reasons. First, the Trustee is seeking neither to recharacterize debt as equity nor to recharacterize a claim. Rather, to prevail, the Trustee must obtain a finding that the Accounts Receivable are property of the estate—as explained above, she cannot. Second, the bankruptcy recharacterization doctrine is not a doctrine that empowers courts to treat property that belongs to one party as though it belongs to another, except potentially to the extent that such a recharacterization is permitted by state law. *Cf. In re Fitness Holdings Intern., Inc.*, 714 F.3d 1141, 1147 (9th Cir. 2013); *Butner*, 440 U.S. at 54.[54]

There is no basis to decide that the Accounts Receivable are the Debtor's property. This result may seem harsh; the Trustee is correct that the SRA put the risk of loss on the Debtor. However, none of the theories that the Trustee has advanced will relieve the Debtor of the bargain it made or turn what was a bad deal into a surprise windfall. "Equity will not relieve a party of its obligations under a contract merely because subsequently, with the benefit of hindsight, it appears to have been a bad bargain." *Raphael v. Booth Mem'l Hosp.*, 412 N.Y.S.2d 409, 411 (App. Div. 1979).

### Resolution of the Claims

The Parties have agreed that the resolution of Claims One through Five, together with 2019 Claims One, Eighteen, and Twenty-Two, are affected by the Court's determinations on the Issues. *See* Briefing Order at 2. In sum, the Court has resolved that the Accounts Receivable never became

---

[54] Since the Trustee has not demonstrated that state law would permit such a recharacterization here, the Court does not reach this issue.

property of the Debtor's estate, and this resolution is generally relevant to the claims at issue because they depend on the Accounts Receivable being property of the estate. *See Reverend C.T. Walker Hous. Dev. Fund Corp. v. City of New York*, 586 B.R. 534, 539 n.8 (E.D.N.Y. 2018) (observing that "[t]he automatic stay only applies to 'property of the estate'" (quoting 11 U.S.C. § 362(a))); *In re Weidenbenner*, No. 15-cv-244, 2019 WL 1856276, at *7 (S.D.N.Y. Apr. 25, 2019) (noting that "[l]ike § 362(a), § 542(b) refers only to 'property of the estate'"); 11 U.S.C. § 547(b) (empowering trustees to "avoid any transfer of an interest of the debtor in property"); 11 U.S.C. § 549(a) (empowering trustees to "avoid a transfer of property of the estate"); 11 U.S.C. § 550 (empowering trustees to recover property avoided under sections 547 and 549 of the Bankruptcy Code, among others).

### The 2020 Claims

These consequences follow: as to Claims Two and Three, the Debtor may not avoid, under section 549 of the Bankruptcy Code, the alleged unauthorized and illegal transfers and misappropriations of the Debtor's property effected by the Post-Petition Assignments of Receivable and Post-Conversion Assignments of Accounts Receivable, since such property did not belong to the Debtor.[55]  The Capstone Defendants are entitled to summary judgment on those claims.  For the same reason, as to Claim Four, the Trustee may not recover for the fraudulent misappropriation and conversion of estate property by the Post-Petition Assignments of Receivable and Post-Conversion Assignments of Accounts Receivable under applicable New York

---

[55] Although in the Decision on Motion to Dismiss, the Court noted that even if Capstone Capital had the right to certain receivables under the SRA, there remained a question of fact of which receivables were transferred Trustee has not briefed whether the Accounts Receivable owed by Costco to Capstone Capital pursuant to the Costco Agreements are coextensive with the receivables actually transferred from the Debtor to Capstone Capital, *In re Level 8 Apparel, LLC*, 2021 WL 408981, at *11, the Trustee has not attempted to demonstrate that the receivables actually transferred were those other than those contemplated by the SRA and sold under the Costco Agreements.  Because the Trustee has failed to argue this point, the Court does not address it herein.

law.  The Capstone Defendants are entitled to summary judgment on that claim.  As to Claim Five, without showing that the Debtor's assets were converted, there is nothing left to aid or abet.  *See Cusack v. Am. Def. Sys., Inc.*, 927 N.Y.S.2d 381, 383 (App. Div. 2011) (explaining that under New York law, an element of conversion is plaintiff's "legal ownership or an immediate superior right of possession to a specific identifiable thing").  The Capstone Defendants are entitled to summary judgment on that claim.

Claim One, so far as it remains following the Decision and Order on Motion to Dismiss, seeks a declaration that the post-petition attempt to perfect a security interest in the Debtor's assets and to exercise control of the Debtor's assets violated section 362 and are void.  Because the Parties have failed to brief the issue, the Court will not address Claim One.

### The 2019 Claims

As for 2019 Claim One,  2019 Claim Eighteen, and 2019 Claim Twenty-Two, although the Parties agreed that the Court should rule on claims from both the 2019 Adversary Proceeding and the 2020 Adversary Proceeding, their briefs and oral argument generally addressed claims from the 2020 Adversary Proceeding, but not the 2019 Adversary Proceeding.  Therefore, the Court limits its decision on those claims.

#### 2019 Claim One

2019 Claim One seeks the avoidance and recovery of preferential transfers.  The Trustee alleges that the SRA between the Debtor and Capstone was a financing device that created only a security interest in the Debtor's assets.  2019 Amended Complaint ¶ 103.  She says that this security interest became unperfected when Capstone's UCC financing statement lapsed on August 12, 2016.  *Id.* ¶ 105.

The Trustee seeks to avoid any putative security interest held by Capstone under the UCC and section 544 of the Bankruptcy Code. *Id.* ¶ 106. The Trustee also seeks to avoid as preferences under section 547 any transfers made to Capstone within 90 days of the bankruptcy filing. *Id.* ¶ 107.

Specifically, the Trustee alleges that assignments of accounts receivable totaling $5,428,652.74 made after August 19, 2016 were made when Capstone's security interest was unperfected. *Id.* ¶¶ 109–10. An exhibit to the 2019 Amended Complaint clarifies that the $5,428,652.74 consists of so-alleged "Pre-Petition Assignments of Costco Receivables to Capstone Credit, LLC." *Id.*, Ex. 6. The Trustee also seeks to avoid $2,847,855.79 in transfers made by Costco to Capstone within 90 days of the bankruptcy filing. *Id.* ¶¶ 111–16. An exhibit to the 2019 Amended Complaint clarifies that the $2,847,855.79 consists of so-alleged "Capstone Cash Collections on Pre-Petition Assignments During the Preference Period" based on a chart netting cash based on "Costco Payment Details." *Id.*, Ex. 8. The Trustee seeks to avoid these transfers as preferences under section 547 of the Bankruptcy Code, or as constructively fraudulent transfers under section 548, and to recover the amounts from Capstone under section 550. *Id.* ¶¶ 117–18.

Because these alleged transfers are of property that did not belong to the Debtor, the Capstone Defendants are entitled to summary judgment on 2019 Claim One.

<u>2019 Claim Eighteen</u>

The Capstone Defendants are not entitled to summary judgment on 2019 Claim Eighteen. 2019 Claim Eighteen alleges that Capstone Capital and Capstone Credit aided and abetted the conversion of various assets and business relationships of the Debtor. The claim asserts that the Capstone Defendants had actual knowledge of many, if not all, of certain wrongful

misappropriations and conversions by former insiders (the "Insiders") of Level 8.  2019 Amended

Complaint ¶¶ 205–06.  The Motions do not brief the extent to which the Capstone Defendants were

aware of such wrongful misappropriations and conversions.

On 2019 Claim Eighteen, the 2019 Amended Complaint alleges that:

1. The Capstone Defendants were aware that key employees of the Debtor,
   including the Insiders, were also acting on behalf of On Five and Liaison
   Apparel. The same small group of personnel conducted business with the
   Capstone Defendants on behalf of all three entities, creating a conflict of
   interest.  2019 Amended Complaint ¶ 206(a).

2. The Capstone Defendants knew of the Debtor's customer relationships,
   including those with Costco Mexico, Boeing, Stein Mart, and Neiman
   Marcus, as the Capstone Defendants factored the accounts receivable from
   these customers.  *Id.* ¶ 206(b).  The Capstone Defendants were aware of the
   Insiders diverting contracts and business from the Debtor by notifying
   vendors that the Debtor had changed its name to On Five.  *Id.*  For example,
   in February 2018, an insider submitted new vendor forms to switch Costco
   Mexico business from "Capstone/Level 8" to On Five.  *Id.*  After the
   conversion of the bankruptcy case, On Five continued to conduct business
   with the Capstone Defendants under conventional factoring agreements.
   From September 2018 to July 2019, the Capstone Defendants made
   payments totaling nearly $1,886,000.00 to On Five under these
   arrangements, including more than $979,000.00 associated with sales to
   Costco Mexico that were improperly diverted from the Debtor to On Five
   prior to the conversion.  *Id.*

3. The Capstone Defendants had knowledge of certain transferred purchase
   orders, such as a $59,609.50 order from Boeing that was moved from the
   Debtor to On Five.  *Id.* ¶ 206(c).  According to the 2019 Amended
   Complaint, the Capstone Defendants must have known about this transfer
   because it was listed as the factor for such orders and would have been
   notified of any changes.  *Id.*

4. The Capstone Defendants knew that only the Debtor had the right to sell
   Tahari-branded products, as acknowledged by the SRA. *Id.* ¶ 206(d).  The
   2019 Amended Complaint alleges that the Capstone Defendants therefore
   must have known that sales of Tahari products by On Five were the result
   of wrongful misappropriation.  *Id.*  Similarly, on October 13, 2017, the
   Capstone Defendants paid On Five $19,996.20 in commissions for William

Rast branded products sold to Costco Mexico, which allegedly belonged to the Debtor. *Id.* This payment was related to a December 2016 licensing agreement between William Rast and On Five. *Id.*

5. The Capstone Defendants knew of a specific transfer of $74,396.22 made to On Five on November 15, 2016, intended to fund the Debtor's payroll. *Id.* ¶ 206(e). The Amended Complaint asserts that Capstone supplied the information for this transfer to the bank and thus knew of its improper purpose. *Id.* This transfer occurred just one day after the Debtor filed for bankruptcy, and the Capstone Defendants counsel had filed a notice of appearance in the bankruptcy case, indicating the Capstone Defendants' awareness that these funds were property of the Debtor's estate. *Id.* ¶¶ 87–89.

6. The Capstone Defendants had outside investors and would have performed due diligence on On Five and Liaison Apparel. For that reason, the Capstone Defendants knew that On Five and Liaison Apparel were start-up companies with no experience or assets beyond what the Debtor's key personnel brought to them. *Id.* ¶ 206(f).

7. The Capstone Defendants had knowledge of the lengthy sales process and payment terms with customers like Costco. *Id.* ¶ 206(g). The 2019 Amended Complaint alleges that the Capstone Defendants therefore knew about valuable work in progress and unpaid invoices that existed on the date of the Conversion, which were then appropriated by Liaison Apparel. *Id.*

The issues briefed by the Parties lack any relationship with these allegations, except a glancing one with the Costco Mexico business. Even there, the issues briefed do not resolve that part of the claim. With respect to the allegations about the Costco Mexico business, the alleged conversion appears to consist of multiple elements: the business relationship with Costco Mexico—which the 2019 Amended Complaint suggests originally belonged to the Debtor, but was improperly transferred to On Five; the accounts receivable from these sales—which should have belonged to the Debtor, but instead were factored by On Five through Capstone; and the proceeds from these sales—namely, $979,000 representing payments made by the Capstone Defendants to On Five for these factored receivables, which should have gone to the Debtor or its estate.

The 2019 Amended Complaint's allegations about a business relationship between Costco and the Debtor are belied by the Costco Wholesale Global Import Supplier Agreement between Capstone Capital and Costco, since that agreement makes clear that Capstone Capital's relationship with Costco extends to its Mexican subsidiary.  Costco Wholesale Global Import Supplier Agreement at 1, ECF No. 124-1.  However, this does not resolve the issue of whether the $979,000 representing alleged payments made by the Capstone Defendants to On Five were payments that were due to the Debtor under the SRA.  Nor do the Motions brief whether such failure could be the proper subject of a conversion claim.  Therefore, the Court denies summary judgment on 2019 Claim Eighteen.

<u>2019 Claim Twenty-Two</u>

Because neither the Trustee nor the Capstone Defendants briefed 2019 Claim Twenty-Two, neither the Trustee nor the Capstone Defendants are entitled to summary judgment on that claim.

## **<u>Conclusion</u>**

For the reasons stated above, the Court awards the Capstone Defendants summary judgment dismissing Claims Two through Five, and 2019 Claim One.  The Court denies the Trustee summary judgment on those claims.  The Court denies the Motions to the extent they seek relief on Claim One and 2019 Claims Eighteen and Twenty-Two.  The Parties are directed to confer and contact chambers to set a date for a pretrial conference.

SETTLE ORDERS.

Dated: July 11, 2024
        New York, New York                    /s/ *James L. Garrity, Jr.*
                                               Honorable James L. Garrity, Jr.
                                               United States Bankruptcy Judge